Sarah V. Fort (admitted *pro hac vice*)
sfort@nrdc.org
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Tel: (202) 513-6247
Fax: (415) 795-4799

Steve Fleischli (CA Bar No. 175174)
sfleischli@nrdc.org
Natural Resources Defense Council
1314 Second Street
Santa Monica, CA 90401
Tel: (310) 434-2328
Fax: (310) 434-2399

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER et al., | No. 2:17-CV-3454 SVW (KSx) |
| Plaintiffs, | **Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss** |
| v. | |
| SCOTT PRUITT, in his official capacity as Administrator of the U.S. Environmental Protection Agency, et al., | Date: Oct. 16, 2017<br>Time: 1:30 p.m.<br>Hon. Stephen V. Wilson |
| Defendants. | Courtroom 10A |

1

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................... 1

BACKGROUND ......................................................................... 1

I.  Statutory and Regulatory Background ................................. 1

II. Procedural History ............................................................. 3

ARGUMENT .............................................................................. 5

I.  This Court has jurisdiction to compel EPA to fulfill its
    nondiscretionary duties under the Clean Water Act............................. 5

    A. The Clean Water Act requires EPA to regulate commercial
       discharges in the Dominguez and Los Cerritos watersheds............... 6

    B. EPA regulations establish an enforceable nondiscretionary
       duty to require permits for commercial stormwater discharges
       in the Dominguez and Los Cerritos watersheds ........................... 10

        1. The Clean Water Act's citizen suit provision waives
           sovereign immunity over nondiscretionary duties
           established by regulation...................................................... 10

        2. EPA regulations establish a nondiscretionary duty
           to require permits for the discharges at issue ........................ 15

II. This Court is the proper forum for Plaintiffs' APA claims................... 19

CONCLUSION ......................................................................... 25

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i

# TABLE OF AUTHORITIES

## Cases

*Adams Fruit Co. v. Barrett,*
    494 U.S. 638 (1990) ............................................................. 11

*Am. Mining Cong. v. U.S. EPA,*
    965 F.2d 759 (9th Cir. 1992)............................................... 20

*Auer v. Robbins,*
    519 U.S. 452 (1997) .................................................... 16, 17

*Bennett v. Spear,*
    520 U.S. 154 (1997) ............................................................... 9

*Bethlehem Steel Corp. v. U.S. EPA,*
    538 F.2d 513 (2d Cir. 1976) ............................................. 24

*Boise Cascade Corp. v. U.S. EPA,*
    942 F.2d 1427 (9th Cir. 1991) .......................................... 24

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988) ......................................................... 19

*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012) ......................................................... 19

*Comm'r of Internal Revenue v. Lundy,*
    516 U.S. 235 (1996) .................................................... 12, 13

*Ctr. for Biological Diversity v. Zinke,*
    No. 16-CV-738 (KBJ), 2017 WL 1755947 (D.D.C. May 4, 2017)........ 11

*Decker v. Nw. Envtl. Def. Ctr.,*
    568 U.S. 597 (2013) ....................................................... 7, 14

*E.I. du Pont de Nemours & Co. v. Train,*
    430 U.S. 112 (1977) .....................................................20-21

*Envtl. Def. Ctr. v. U.S. EPA,*
    344 F.3d 832 (9th Cir. 2003)............................................. 3, 6

ii

*Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.*,
    266 F. Supp. 2d 1101 (N.D. Cal. 2003) ......................................... 22, 23

*FAA v. Cooper*,
    566 U.S. 284 (2012) ................................................................. 14

*Friends of Pinto Creek v U.S. EPA*,
    504 F.3d 1007 (9th Cir. 2007) .............................................. 4

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) ................................................................. 16

*Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations*,
    730 F.3d 1024 (9th Cir. 2013) ..................................................... 17

*Inv. Co. Inst. v. Bd. of Governors of Fed. Reserve Sys.*,
    551 F.2d 1270 (D.C. Cir. 1977) .............................................. 5

*Kennecott Copper Corp. v. Costle*,
    572 F.2d 1349 (9th Cir. 1978) ...........................................9, 16

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Forsgren*,
    309 F.3d 1181 (9th Cir. 2002) ..................................................... 20, 25

*Maier v. U.S. EPA*,
    114 F.3d 1032 (10th Cir. 1997) .............................................. 24

*Maine v. Thomas*,
    874 F.2d 883 (1st Cir. 1989) ................................................ 15

*Massachusetts v. U.S. EPA*,
    549 U.S. 497 (2007) ................................................................. 9

*Narragansett Elec. Co. v. U.S. EPA*,
    407 F.3d 1 (1st Cir. 2005) ........................................................ 19

*Nat'l Wildlife Fed. v. Browner*,
    127 F.3d 1126 (D.C. Cir. 1997) ...........................................9, 15

*Norton v. S. Utah Wilderness All.* (*SUWA*),
    542 U.S. 55 (2004) .................................................................11, 15

*NRDC v. Costle*,
    568 F.2d 1369 (D.C. Cir. 1977) .............................................. 2, 6-7, 7, 8

*NRDC v. Train*,
    519 F.2d 287 (D.C. Cir. 1975) ......................................................... 24

*NRDC v. Train*,
    545 F.2d 320 (2d Cir. 1976)........................................................ 10, 16

*NRDC v. U.S. EPA*,
    966 F.2d 1292 (9th Cir. 1992) ..................................................... 3, 7, 8

*NRDC v. U.S. EPA*,
    542 F.3d 1235 (9th Cir. 2008) ............................................................. 3

*Nw. Envtl. Advocates v. U.S. EPA*,
    537 F.3d 1006 (9th Cir. 2008).....................................................passim

*Our Children's Earth Found. v. U.S. EPA*,
    527 F.3d 842 (9th Cir. 2008).............................................................. 8

*Price v. Stevedoring Servs. of Am., Inc.*,
    697 F.3d 820 (9th Cir. 2012).................................................8, 16-17, 17

*Richlin Sec. Serv. Co. v. Chertoff*,
    553 U.S. 571 (2008) ....................................................................... 14

*S. Cal. All. of Publicly Owned Treatment Works v. U.S. EPA*,
    853 F.3d 1076 (9th Cir. 2017) .....................................................23, 24

*Save Our Cumberland Mountains, Inc. v. Lujan*,
    963 F.2d 1541 (D.C. Cir. 1992) ....................................................... 14

*Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*,
    674 F.3d 97 (1st Cir. 2012) .........................................................11, 15

*Sierra Club v. Johnson*,
    No. C 08-01409 WHA, 2009 WL 2413094 (N.D. Cal. Aug. 5, 2009)..... 8

*Sierra Club v. Leavitt*,
    355 F. Supp. 2d 544 (D.D.C. 2005)................................................... 13

*Sierra Club v. Thomas*,
    828 F.2d 783 (D.C. Cir. 1987) ............................................................. 8

*Sierra Club v. Whitman*,
    268 F.3d 898 (9th Cir. 2001) ...................................................... 10, 14

*Stone v. INS*,
    514 U.S. 386 (1995) ............................................................................ 11

*Sullivan v. Stroop*,
    496 U.S. 478 (1990) ............................................................................ 13

*U.S. Dep't of Energy v. Ohio*,
    503 U.S. 607 (1992) ............................................................................ 14

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ............................................................................ 19

*United States v. Nordic Vill., Inc.*,
    503 U.S. 30 (1992) .............................................................................. 15

*Viet. Veterans of Am. v. Cent. Intelligence Agency*,
    811 F.3d 1068 (9th Cir. 2016) .......................................................... 11

*W. Radio Servs. Co. v. Qwest Corp.*,
    678 F.3d 970 (9th Cir. 2012) ............................................................ 17

*WildEarth Guardians v. McCarthy*,
    772 F.3d 1179 (9th Cir. 2014) ........................................................ 6, 8

## Statutes and Regulations

16 U.S.C. § 1533(b)(2) ................................................................................ 9

28 U.S.C. § 2401(a) ................................................................................... 19

33 U.S.C. § 1251(a) ..................................................................................... 1

33 U.S.C. § 1251(d) .............................................................................. 6, 12

33 U.S.C. § 1251(e) ................................................................................... 12

33 U.S.C. § 1281(g)(1) ........................................................................... 12

33 U.S.C. § 1311 ............................................................................... 1, 6, 7

33 U.S.C. § 1319(a)(5)(B) ...................................................................... 12

33 U.S.C. § 1322(a)(7) ............................................................................ 12

33 U.S.C. § 1342 ....................................................................................... 2

33 U.S.C. § 1342(a)(1) .............................................................................. 6

33 U.S.C. § 1342(p) ............................................................................... 2, 7

33 U.S.C. § 1342(p)(1) .............................................................................. 7

33 U.S.C. § 1342(p)(2) .............................................................................. 7

33 U.S.C. § 1342(p)(2)(E) ............................................................... passim

33 U.S.C. § 1342(p)(4) .............................................................................. 3

33 U.S.C. § 1342(p)(6) .............................................................................. 3

33 U.S.C. § 1342(m) ............................................................................... 13

33 U.S.C. § 1345(g)(2) ........................................................................ 12-13

33 U.S.C. § 1365(a)(1) ................................................................... 12, 13, 14

33 U.S.C. § 1365(a)(2) ..................................................................... passim

33 U.S.C. § 1365(b)(2) .............................................................................. 5

33 U.S.C. § 1365(f) ................................................................................. 12

33 U.S.C. § 1369(b)(1) ..................................................................... passim

33 U.S.C. § 1369(b)(2) ........................................................................ 19-20

33 U.S.C. § 1369(b)(1)(F) ................................................................... 20, 21

40 C.F.R. § 122.26(a)(9) ........................................................................ 3, 17, 19

40 C.F.R. § 122.26(a)(9)(i)(D) ........................................................ 3, 5, 15-16

40 C.F.R. § 122.26(f)(2) ................................................................................ 4

40 C.F.R. § 122.26(f)(5) ................................................................................ 4

38 Fed. Reg. 13,528 (May 22, 1973) ........................................................... 2

55 Fed. Reg. 47,990 (Nov. 16, 1990) ......................................................... 18

64 Fed. Reg. 68,722 (Dec. 8, 1999) ............................................................ 18

**Other Authorities**

132 Cong. Rec. S16425 (daily ed. Oct. 16, 1986) ...................................... 2

132 Cong. Rec. S16436 (daily ed. Oct. 16, 1986) ...................................... 7

132 Cong. Rec. S16443 (daily ed. Oct. 16, 1986) ...................................... 7

H.R. Rep. No. 92-911 (1972) ..................................................................... 20

U.S. EPA, National Probable Sources Contributing to Impairments .............. 3

**INTRODUCTION**

When it rains in Los Angeles, water falls on parking lots, roofs, and roadways. As it lands, it mobilizes pollutants that have built up on those surfaces, and carries those pollutants with it as it flows, untreated, into local waterways and ultimately, the ocean. This phenomenon—termed stormwater pollution—is the most significant source of water pollution in the Los Angeles area. And, though the U.S. Environmental Protection Agency (EPA) has a duty to require permits for commercial site stormwater discharges if they contribute to violations of water quality standards, the agency refuses to do so.

On behalf of their members, Los Angeles Waterkeeper, Natural Resources Defense Council, and American Rivers (collectively, Los Angeles Waterkeeper) seek to compel EPA to fulfill its duty under the Clean Water Act to require commercial, institutional, and industrial dischargers of stormwater to obtain permits that would impose limits on the pollutants that run off their sites.[1] To avoid doing so, EPA advances an implausibly narrow interpretation of its responsibilities under the Clean Water Act and an implausibly broad interpretation of appellate court review. Neither interpretation is tenable, and neither is entitled to deference. EPA's motion should be denied.

**BACKGROUND**

**I.    Statutory and Regulatory Background**

Congress passed the Federal Water Pollution Control Act Amendments (commonly known as the Clean Water Act) in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). As its core method of improving water quality, the Act establishes a blanket prohibition on the discharge of any pollutant absent compliance with the Act. Id. § 1311(a). The principal means of compliance is

---

[1] For simplicity's sake, we refer to these sources as "commercial" dischargers.

1

to obtain a discharge permit through the National Pollutant Discharge Elimination System (NPDES) program. *See id.* § 1342.

Nearly half a century after the Clean Water Act was enacted, many of our country's waterways are still badly polluted. In Los Angeles, stormwater runoff remains a particularly intractable problem. Los Angeles waterways regularly violate water quality standards for heavy metals like zinc and copper—pollutants that are found at elevated concentrations in stormwater discharges. Compl. ¶¶ 45, 49, 59, ECF No. 1. These pollutants are potent toxins to aquatic organisms, and make waterways unsafe and unenjoyable for people who live, work, and play nearby. *Id.* ¶¶ 37-38, 42-54.

Nonetheless, for nearly as long as stormwater pollution has plagued urban waterways, EPA has sought to avoid regulating it. In 1973, in one of its first decisions under the new Clean Water Act, EPA issued regulations that exempted the vast majority of stormwater discharges from permit requirements. 38 Fed. Reg. 13,528, 13,530 (May 22, 1973). The agency asserted that it had no duty to regulate the discharges, both because it had broad discretion under the Act, and because subjecting the discharges to permits would impose "unmanageable administrative burdens" on the agency. *NRDC v. Costle*, 568 F.2d 1369, 1374 (D.C. Cir. 1977). The D.C. Circuit disagreed, holding that despite the administrative complications associated with implementing the law, EPA had no authority to categorically exempt stormwater discharges from the Act's permitting requirement. *Id.* at 1377-79.

EPA's slow pace in addressing stormwater continued into the 1980s, prompting Congress to amend the Clean Water Act in 1987 to specifically mandate that the agency issue NPDES permits to regulate stormwater discharges. 33 U.S.C. § 1342(p); *see also* 132 Cong. Rec. S16425 (daily ed. Oct. 16, 1986) (statement of Sen. Stafford) ("EPA should have developed this program long ago. Unfortunately, it did not."). The amendments identified

2

five high-priority categories of stormwater that the agency was required to regulate, including discharges that the agency "determines . . . contribute[] to a violation of a water quality standard." 33 U.S.C. § 1342(p)(2)(E). Congress also required the agency to promulgate additional stormwater management regulations, widely known as "Phase I" and "Phase II" regulations. *See* 33 U.S.C. § 1342(p)(4), (6). Those regulations identify several categories of discharges that "shall be required to obtain a NPDES permit," 40 C.F.R. § 122.26(a)(9), including discharges from any source or category of sources that the State or EPA Regional Administrator determines contribute to a violation of a water quality standard. *Id.* § 122.26(a)(9)(i)(D).

Since Congress amended the Clean Water Act to address stormwater pollution, EPA's lax approach to stormwater regulation has been repeatedly challenged, and repeatedly rejected as insufficient. *See NRDC v. U.S. EPA*, 966 F.2d 1292, 1309-10 (9th Cir. 1992); *Envtl. Def. Ctr. v. U.S. EPA*, 344 F.3d 832, 879 (9th Cir. 2003); *NRDC v. U.S. EPA*, 542 F.3d 1235, 1240-41, 1253 (9th Cir. 2008). Nonetheless, the agency continues to invoke its discretion to regulate according to its own preferences, pointing to the alleged adequacy of existing programs and the administrative burdens that more safeguards would impose. *NRDC*, 542 F.3d at 1240-41, 1253 (citing, and rejecting, EPA's position that its failure to act was justified because "it believed that [the discharges at issue] were already 'being adequately addressed' . . . and that the cost [of requiring additional limits] was 'simply too high'"). In the meantime, EPA estimates that urban runoff contributes to water quality violations in over 60,000 miles of streams, 765,000 acres of lakes, and 16,500 square miles of bays and estuaries. *See* U.S. EPA, National Probable Sources Contributing to Impairments, https://ofmpub.epa.gov/waters10/attains_nation_cy.control#prob_source.

## II.    Procedural History

EPA's stormwater regulations provide that any person may petition the

3

agency "to require a NPDES permit for a discharge which is composed entirely of storm water which contributes to a violation of a water quality standard." 40 C.F.R. § 122.26(f)(2). The agency "shall make a final determination" on any such petition within ninety days. *Id*. § 122.26(f)(5).

In 2015, Plaintiffs submitted two petitions under 40 C.F.R. § 122.26(f)(2) to EPA Region 9—the region that oversees Clean Water Act compliance in California. The petitions targeted two different Los Angeles-area watersheds: (1) the Dominguez Channel and Los Angeles/Long Beach Inner Harbor watershed, and (2) the Los Cerritos Channel and Alamitos Bay watershed (collectively, the Dominguez and Los Cerritos Channel watersheds). Cirino Decl., Ex. A at 1 (Dominguez Pet.), Ex. B at 1 (Los Cerritos Pet.), ECF No. 39-2. Each petition sought "a determination that stormwater discharges from [commercial] sites contribute to water quality standards violations in [the watershed] and require Clean Water Act permits." *Id*. The petitions provided evidence that stormwater discharges from sites like malls, office buildings, warehouses, and storage yards are impairing water quality in both watersheds. Dominguez Pet. at 12-23; Los Cerritos Pet. at 12-24.

EPA responded to both petitions in 2016. Compl. ¶ 7. The agency agreed with Plaintiffs that the data "demonstrate that, as a category, [commercial] sources contribute to water quality impairments for copper and zinc" in the Dominguez and Los Cerritos Channel watersheds.[2] Cirino Decl., Ex. C at 5 (Dominguez Pet. Denial), Ex. D at 5 (Los Cerritos Pet. Denial), ECF No. 39-2; *see also* Dominguez Pet. Denial at 16 ("Region 9 concludes . . . that there are sufficient data available to demonstrate that stormwater discharges are contributing to water quality impairments in [the watershed]."); Los Cerritos

---

[2] A "water quality impairment" is a violation of a water quality standard. *See Friends of Pinto Creek v U.S. EPA*, 504 F.3d 1007, 1011 (9th Cir. 2007).

Pet. Denial at 17 (same). Nonetheless, the agency refused to require permits. It based its decision on the conclusion that "existing programs . . . adequately address the impairments," and on "the resource implications" associated with requiring permits. Dominguez Pet. Denial at 16; Los Cerritos Pet. Denial at 17. The agency indicated it might decide to require permits at a later time. *Id.*

On February 27, 2017, Plaintiffs sent EPA notice of their intent to sue the agency for its failure to regulate commercial discharges that are contributing to water quality standard violations in the Dominguez and Los Cerritos Channel watersheds. *See* Compl. Ex. A, ECF No. 1-1; 33 U.S.C. § 1365(b)(2) (outlining notice requirement). On May 8, Plaintiffs filed a complaint in this Court, alleging (1) a failure to perform a nondiscretionary duty under the Clean Water Act pursuant to 33 U.S.C. § 1365(a)(2); and (2) in the alternative, arbitrary and capricious agency action in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2).[3] Compl. ¶¶ 83-91.

## ARGUMENT

## I. This Court has jurisdiction to compel EPA to fulfill its nondiscretionary duties under the Clean Water Act

The Clean Water Act and EPA's own regulations require NPDES permits for stormwater discharges the Administrator determines "contribute[] to a violation of a water quality standard." 33 U.S.C. § 1342(p)(2)(E); 40 C.F.R § 122.26(a)(9)(i)(D). In response to Los Angeles Waterkeeper's

---

[3] Plaintiffs also filed a protective petition for review in the Ninth Circuit to preserve their right to review under 33 U.S.C. § 1369 in the event this Court determines jurisdiction is not proper here. *See Inv. Co. Inst. v. Bd. of Governors of Fed. Reserve Sys.*, 551 F.2d 1270, 1280 (D.C. Cir. 1977) ("If any doubt as to the proper forum exists, careful counsel should file suit in both the court of appeals and the district court . . . ."). Plaintiffs have filed a motion to stay that case. Pet'rs' Mot. to Stay Proceedings Pending District Court Review, *Los Angeles Waterkeeper et al. v. Pruitt*, No. 17-70570 (March 2, 2017), ECF No. 3-1.

petitions, EPA concluded that commercial stormwater discharges are contributing to water quality standard violations in the Dominguez and Los Cerritos Channel watersheds. Dominguez Pet. Denial at 16; Los Cerritos Pet. Denial at 17. Under the plain language of the Act and regulations, that determination triggers a "clear-cut" and "readily ascertainable" duty to require permits for these discharges. *See WildEarth Guardians v. McCarthy*, 772 F.3d 1179, 1182 (9th Cir. 2014).

To avoid this duty, EPA returns to an old refrain: that the agency has discretion to regulate stormwater how it chooses. *See, e.g.*, EPA Mem. in Supp. of Mot. to Dismiss at 13, 17, ECF 39-1 (EPA Br.). That interpretation is contrary to the plain meaning of the statute and regulations, and is entitled to no deference. Los Angeles Waterkeeper has properly alleged a failure to perform a nondiscretionary duty under the Clean Water Act, and this Court has subject matter jurisdiction to compel the agency to fulfill that duty.

**A. The Clean Water Act requires EPA to regulate commercial discharges in the Dominguez and Los Cerritos watersheds**

The Clean Water Act prohibits the discharge of pollutants from a point source without an NPDES permit. *Envtl. Def. Ctr.*, 344 F.3d at 841; 33 U.S.C. § 1311(a). That prohibition is "[t]he 'cornerstone' and 'fundamental premise' of the Clean Water Act." *Nw. Envtl. Advocates v. U.S. EPA*, 537 F.3d 1006, 1022 (9th Cir. 2008) (citations omitted). EPA is responsible for administering the NPDES program, 33 U.S.C. § 1251(d), and the Act grants the agency the authority to "issue a permit for the discharge of a pollutant or combination of pollutants." 33 U.S.C. § 1342(a)(1).

The Act does not, however, grant the agency any authority to *exempt* sources from its permitting requirements. *Nw. Envtl. Advocates*, 537 F.3d at 1021-22. If a discharge is covered by § 1311's prohibition, the Act gives the agency only two choices: "either to issue a permit or to leave the discharge

6

subject to the total proscription of [§ 1311]." *Id.* at 1022 (quoting *Costle*, 568 F.2d at 1375). That is "the natural reading [of the Clean Water Act]," and "the one that retains the fundamental logic of the statute." *Id.* (quoting *Costle*).

In 1987, Congress amended the Act with the express purpose of subjecting stormwater discharges to § 1311's prohibition and the NPDES permitting requirements. *See* 33 U.S.C. § 1342(p). It did so because, "[d]espite [the Act's] clear directive, EPA ha[d] failed to require most stormwater point sources to apply for permits which would control the pollutants in their discharge." 132 Cong. Rec. S16443 (daily ed. Oct. 16, 1986) (statement of Sen. Durenberger). Section 1342(p) establishes a temporary moratorium during which the agency "shall not require a permit" for most stormwater discharges. 33 U.S.C. § 1342(p)(1). However, it specifies five categories of discharges for which that moratorium "shall not apply." 33 U.S.C. § 1342(p)(2). Paragraph (p)(2) thus presents five exceptions to (p)(1)'s exemption—that is, five categories of discharges that are subject to § 1311's discharge prohibition, and are unlawful unless covered by a permit. *See Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 601 (2013) ("a permit is required" for discharges that fall within (p)(2)(B)); *see also NRDC v. U.S. EPA*, 966 F.2d at 1296 (paragraph (p)(2) sets out "five exceptions that are required to obtain permits"); 132 Cong. Rec. S16436 (daily ed. Oct. 16, 1986) (statement of Sen. Chafee) (describing legislation as "set[ting] up a program whereby EPA *must issue permits*" for categories of sources listed in (p)(2) (emphasis added)). Among the five stormwater categories for which the Act requires permits are "discharge[s] for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard . . . ." 33 U.S.C. § 1342(p)(2)(E).

In its petition denials, EPA concluded that stormwater discharges are contributing to violations of water quality standards in the Dominguez and

Los Cerritos Channel watersheds. *See* Dominguez Pet. Denial at 16; Los Cerritos Pet. Denial at 17. The agency thus squarely determined that commercial site discharges in both watersheds satisfy the statute's permitting criterion. Having done so, the agency has no discretion to excuse those discharges from the Act's permitting requirements. The agency's duty here is "clear-cut" and "readily ascertainable from the statute." *WildEarth Guardians*, 772 F.3d at 1182. EPA must issue permits to control and regulate those discharges, or else prohibit them outright.

EPA argues that § 1342(p)(2)(E) authorizes, but does not require, the agency to mandate permits for discharges that contribute to violations of water quality standards. EPA Br. at 13. EPA's interpretation is contrary to Congress's "plain . . . intent to require permits in any situation of pollution from point sources." *Nw. Envtl. Advocates*, 537 F.3d at 1022 (quoting *Costle*, 568 F.2d at 1383). It is also contrary to the Ninth Circuit's repeated conclusions that, if the Act requires a source to obtain permits, EPA has no authority to issue an exemption. *See, e.g.*, *id.* at 1021-22; *NRDC v. U.S. EPA*, 966 F.2d at 1306. This Court owes no deference to EPA's interpretation. *See Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 825-32 (9th Cir. 2012) (court owes no deference to agency's litigating position on the proper interpretation of a statute); *see also Our Children's Earth Found. v. U.S. EPA*, 527 F.3d 842, 851 (9th Cir. 2008) (in determining whether a statute establishes a nondiscretionary duty, courts do not defer to the agency's interpretation).

EPA also cites to an out-of-circuit case for the proposition that, to establish a nondiscretionary duty, plaintiffs must point to a "date-certain deadline." *See* EPA Br. at 13 (citing *Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987)). The Ninth Circuit has never expressed such a requirement. *See Sierra Club v. Johnson*, No. C 08-01409 WHA, 2009 WL 2413094, at *3 (N.D. Cal. Aug. 5, 2009). The D.C. Circuit—to which EPA cites for the

proposition, *see* EPA Br. at 13—has expressly declined to reach the question whether a deadline is necessary in the context of a Clean Water Act citizen suit. *Nat'l Wildlife Fed. v. Browner*, 127 F.3d 1126, 1129 n.6 (D.C. Cir. 1997). And the Supreme Court has found a nondiscretionary duty in the absence of such a deadline, reasoning that a provision of the Endangered Species Act that directs that the Secretary "shall . . . take into consideration the economic impact" compels the agency to do so. *Bennett v. Spear*, 520 U.S. 154, 172 (1997) (quoting 16 U.S.C. § 1533(b)(2)). In reaching its conclusion, the Court did not rely on the existence or absence of a deadline; rather, it concluded that the duty was mandatory because the statute's terms were "plainly those of obligation rather than discretion." *Id.*

That the agency here exercised some discretion in making the triggering determination is irrelevant; it is well established that a discretionary agency action can trigger subsequent, nondiscretionary duties. For instance, in *Kennecott Copper Corp. v. Costle*, 572 F.2d 1349 (9th Cir. 1978), the Ninth Circuit evaluated a provision of the Clean Air Act that provided that "[t]he Administrator shall approve any revision of an implementation plan . . . if he determines that it meets the requirements of paragraph (2)." *Id.* at 1354. Acknowledging that the determination whether a plan meets the statute's requirements involves the exercise of agency discretion, the court concluded that, once the agency made that decision, "there is a nondiscretionary duty to act in accordance with [the] determination." *Id.* at 1355; *see also Massachusetts v. U.S. EPA*, 549 U.S. 497, 533 (2007) ("If EPA makes a finding of endangerment, the Clean Air Act *requires* the Agency to regulate emissions . . . ." (emphasis added)). That matches the facts here: EPA determined that commercial stormwater discharges contribute to water quality standards violations in these watersheds, which triggered the nondiscretionary duty to regulate those discharges with permits.

9

Similarly, in *NRDC v. Train*, 545 F.2d 320 (2d Cir. 1976), the court considered a Clean Air Act provision that requires the EPA Administrator to publish a list of each pollutant "which in his judgment has an adverse effect on public health or welfare." *Id*. at 322. EPA determined that lead met the statutory criterion, but maintained that the Administrator "retains discretion whether to list," arguing that listing lead was "one of numerous alternative control strategies for lead available to it." *Id*. at 324. The Second Circuit rejected that interpretation, holding that "[o]nce the conditions [of the statute] have been met, the listing of lead . . . become[s] mandatory." *Id*. at 328.

Here, EPA has unambiguously concluded that the conditions of § 1342(p)(2)(E) are met. Accordingly, the agency has a nondiscretionary duty either to require permits or to prohibit the discharges altogether. *See Nw. Envtl. Advocates*, 537 F.3d at 1022. It may not choose to do nothing.

### B. EPA regulations establish an enforceable nondiscretionary duty to require permits for commercial stormwater discharges in the Dominguez and Los Cerritos watersheds

Even if EPA were not under a statutory duty to act, EPA's own regulations mandate that the agency require commercial discharges that contribute to water quality impairments in the Dominguez and Los Cerritos Channel watersheds to obtain permits. That duty is actionable under the Act's citizen suit provision.

#### 1. The Clean Water Act's citizen suit provision waives sovereign immunity over nondiscretionary duties established by regulation

The Clean Water Act authorizes suit "against the Administrator where there is alleged a failure . . . to perform any act or duty under this chapter which is not discretionary." 33 U.S.C. § 1365(a)(2). It is an unambiguous and unequivocal waiver of sovereign immunity over suits that seek to compel the agency to fulfill a mandatory duty. *See, e.g.*, *Sierra Club v. Whitman*, 268 F.3d

10

898, 901 (9th Cir. 2001). Because the citizen suit provision defines the scope of judicial review and is "jurisdictional in nature," *see Stone v. INS*, 514 U.S. 386, 405 (1995), the Court owes no deference to EPA's interpretation of its meaning. *See Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990).

To begin, there is no question that regulations can create binding, nondiscretionary duties. The Supreme Court has confirmed that agencies may be sued under the APA for failure to perform a nondiscretionary duty established by regulation, *Norton v. S. Utah Wilderness All.* (*SUWA*), 542 U.S. 55, 64-65 (2004), and the Ninth Circuit has ordered agencies to fulfill mandatory duties created by regulation, *see Viet. Veterans of Am. v. Cent. Intelligence Agency*, 811 F.3d 1068, 1076-79 (9th Cir. 2016). Other courts have similarly affirmed that "the 'law' that generates a mandatory duty need not be a statute—it can also be an 'agency regulation[] that ha[s] the force of law.'" *Ctr. for Biological Diversity v. Zinke*, No. 16-CV-738 (KBJ), 2017 WL 1755947, at *6 (D.D.C. May 4, 2017) (quoting *SUWA*) (alterations in original); *see also Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*, 674 F.3d 97, 100 (1st Cir. 2012) ("Regulations can, by themselves, . . . impose legal duties on federal officers . . . .").

EPA argues that these duties, though mandatory, are not enforceable through a Clean Water Act citizen suit. But by its terms, the citizen suit provision applies to any nondiscretionary act or duty *under* the Clean Water Act. The plain meaning of that phrase is clear: it refers to legal obligations that arise from the Clean Water Act and its implementing regulations. EPA's contention that it "can only be ordered to perform a mandatory duty if it is required by statute," EPA Br. at 14, misreads "under this chapter" as meaning "in this chapter," and is at odds with the use of the phrase throughout the Act.

Most obviously, it is inconsistent with the use of the phrase within the citizen suit provision itself. The same sentence that authorizes suit over an

11

agency failure to perform a nondiscretionary duty also authorizes suit over the violation of "an effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a)(1). That phrase is defined to include several sources of effluent standards or limitations beyond the statute itself, including "a regulation under section 1345(d)." *Id.* § 1365(f). It defies logic to suggest that Congress understood the phrase "under this chapter" to include regulations in subsection (a)(1), but exclude them in subsection (a)(2). *See Comm'r of Internal Revenue v. Lundy*, 516 U.S. 235, 249-50 (1996) ("[W]e have been given no reason to believe that Congress meant the term 'claim' to mean one thing in § 6511 but to mean something else altogether in the very next section of the statute.").

Nor is EPA's interpretation consistent with the Act's repeated use of "under this chapter" and similar phrases to refer to subsequent agency actions that implement and elaborate on the statute's terms. For instance, § 1319 refers to "any permit issued under this chapter." 33 U.S.C. § 1319(a)(5)(B). No permits are issued in the Clean Water Act itself; thus, "under this chapter" cannot refer only to the contents of the Act. Several provisions of the Act specifically discuss regulations issued "under" the Act. For instance, § 1251 encourages public participation in the "enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter." *Id.* § 1251(e); *see also id.* § 1322(a)(7) (defining "manufacturer" as a person "subject to standards and regulations promulgated under this section").

Time and again, the Act uses the phrase "under this chapter" to refer to future programs that implement and give effect to the Act's provisions—not just those specifically set out in the Act. By contrast, where Congress sought to refer only to the contents of the Act itself, it chose to use the more limited term "in." *See, e.g.*, *id.* § 1251(d) ("[e]xcept as otherwise expressly provided in this chapter"); *id.* § 1281(g)(1) (referring to "definition set forth in § 1292(2)"); *id.*

12

§ 1345(g)(2) (discussing "public information and education projects authorized in this section"). Indeed, Congress at times used both terms within the same sentence: for instance, stating that "[n]othing in this subsection shall affect the Administrator's authority under sections 1317 and 1319." *Id*. § 1342(m).

It is a longstanding rule of statutory construction that "identical words used in different parts of the same act are intended to have the same meaning." *Comm'r of Internal Revenue*, 516 U.S. at 250 (quoting *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990)). The agency gives no explanation why Congress would have intended the phrase to have one meaning throughout the Act, and a different and more limited meaning in one half of the citizen suit provision.

For all these reasons, the only court to have analyzed this issue—in the context of the Clean Air Act's analogous citizen suit provision—held that regulations issued pursuant to that Act's authority were enforceable against the agency by citizen suit. *Sierra Club v. Leavitt*, 355 F. Supp. 2d 544, 555-57 (D.D.C. 2005). The court determined that, "although the phrase 'under this chapter' as used in the Clean Air Act is not defined, its meaning is readily discernable through the application of traditional tools of statutory construction." *Id*. at 555. After reviewing the use of the phrase throughout the Act, the court concluded that "it is clear that the phrase 'under this chapter' encompasses both the statutory obligations imposed in the Act itself, and the regulatory obligations promulgated under the auspices of the Act." *Id*. at 556.

EPA takes issue with that court's decision, *see* EPA Br. at 15 n.5, but its attempts to undermine the court's reasoning are unpersuasive. First, EPA argues that the fact that Congress defined "effluent standard or limitation under this chapter" in 33 U.S.C. § 1365(a)(1) to include regulatory standards and limitations does not mean that it intended to define "act or duty under this chapter" in subsection (a)(2) to include regulatory acts or duties. *Id.* But it means exactly that. The Act's citizen suit provision vests two parallel forms of

13

enforcement power in the public: first, subsection (a)(1) provides a mechanism for enforcement against regulated entities; second, subsection (a)(2) provides a mechanism for enforcement against the regulator. *See Save Our Cumberland Mountains, Inc. v. Lujan*, 963 F.2d 1541, 1542-43, 1547 (D.C. Cir. 1992). The words immediately preceding "under this chapter" define what is to be enforced—effluent standards or limitations in one instance, agency acts or duties in the other. They do not evince any intent to define "under this chapter" in different ways in two clauses of the same sentence.

Second, while EPA argues that the presumption of consistent usage canon is inapplicable because the usage in subsection (a)(2) occurs in the context of a waiver of sovereign immunity, EPA Br. at 15 n.5, the Supreme Court has held that "the sovereign immunity canon . . . does not 'displac[e] the other traditional tools of statutory construction.'" *FAA v. Cooper*, 566 U.S. 284, 291 (2012) (quoting *Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 589 (2008)). Further, EPA ignores that the usage in subsection (a)(1) also occurs in the context of a waiver of sovereign immunity. Subsection (a)(1) abolishes sovereign immunity for claims against the United States based on ongoing violations of "effluent standards or limitations under this chapter." 33 U.S.C. § 1365(a)(1) (providing for suit "against any person (including (i) the United States[)]"); *see U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 619 (1992) (referring to § 1365(a)(1)'s "explicit authorization[] for suits against the United States"). This waiver unequivocally extends to obligations imposed by regulations. *See Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 608 (2013) (citizen suit under § 1365(a)(1) is proper where it "seeks to enforce an obligation imposed by the Act or its regulations"). In the same sentence, subsection (a)(2) uses the same language to waive sovereign immunity for claims against the EPA for failure to perform a nondiscretionary "act or duty under this chapter." 33 U.S.C. § 1365(a)(2); *Sierra Club v. Whitman*, 268 F.3d at 901. That this waiver also

14

covers obligations imposed by regulations is unambiguous. The premise of EPA's argument—that Congress used the same words to waive sovereign immunity in both subsections (a)(1) and (a)(2), but meant for the scope of the waiver to be different in the two provisions—is not a "plausible" reading of the statute. *See United States v. Nordic Vill., Inc.*, 503 U.S. 30, 37 (1992).

Finally, a passing sentence in *Maine v. Thomas*, 874 F.2d 883, 888 n.7 (1st Cir. 1989), does not support the burden EPA places on it. EPA Br. at 14. That case provides no explanation for its theory that nondiscretionary regulatory duties cannot be enforced by citizen suit, and its cursory treatment of the issue has been dismissed by the D.C. Circuit as "dicta in a footnote," *Nat'l Wildlife Fed'n v. Browner*, 127 F.3d 1126, 1129 n.5 (D.C. Cir. 1997). Further, the opinion predates the Supreme Court's decision in *SUWA*. In the context of the APA's similar provision for suit to compel agency action, the First Circuit has since embraced *SUWA*'s reasoning, stating that "[r]egulations can, by themselves, not only impose liabilities on non-federal parties but also impose legal duties on federal officers." *Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*, 674 F.3d 97, 100 (1st Cir. 2012).

EPA's tortured interpretation of the Clean Water Act's citizen suit provision, which is entitled to no deference, cannot stand. Regulations can, and do, establish binding nondiscretionary duties, and the citizen suit provision empowers the public to sue the agency when it fails to fulfill its duties under those regulations.

### 2. EPA regulations establish a nondiscretionary duty to require permits for the discharges at issue

EPA's stormwater permitting regulations provide that "operators *shall be required* to obtain a NPDES permit" if an EPA Regional Administrator "determines that the discharge, or category of discharges within a geographic area, contributes to a violation of a water quality standard." 40 C.F.R.

§ 122.26(a)(9)(i)(D) (emphasis added). The Regional Administrator has made that determination, and the agency now has an obligation to require operators to obtain a permit.

EPA makes much of the fact that the regulation "refers to a determination that is within the EPA Regional Administrator's discretion to make." EPA Br. at 17. Whether true or not, that is beside the point: the agency already determined that the relevant sources are contributing to water quality impairments. Dominguez Pet. Denial at 16; Los Cerritos Pet. Denial at 17. Thus, the relevant question is not whether that determination was discretionary, but whether, having made that determination, the agency may nonetheless refuse to require permits.

Under *NRDC v. Train* and *Kennecott Copper*, supra pp. 12-13, it cannot. While the agency possessed some discretion in considering what determination to make, it is now subject to "a nondiscretionary duty to act in accordance with [its] determination." *See Kennecott Copper*, 572 F.2d at 1355; *Train*, 545 F.2d at 328. Having concluded that stormwater discharges from commercial sites are contributing to water quality impairments, the agency has a duty to require permits.

The agency's contrary interpretation of its regulations is not entitled to deference. EPA argues that its interpretation should receive deference under *Auer v. Robbins*, 519 U.S. 452, 461 (1997). EPA Br. at 18. But *Auer* deference is inapplicable where "the underlying regulation does little more than restate the terms of the statute itself." *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006). This is because an "agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language." *Id.* Because EPA's regulation does nothing more than repeat the language of 33 U.S.C. § 1342(p)(2)(E), "the question [is] really one of *statutory* interpretation,"

16

1    and *Auer* deference is inapplicable. *Price v. Stevedoring Servs. of Am., Inc.*, 697
2    F.3d 820, 829 (9th Cir. 2012).

3         Even if *Auer* were applicable, this Court owes no deference if an agency
4    interpretation is inconsistent with the plain meaning of a regulation, or if there
5    is reason to suspect it "does not reflect the agency's fair and considered
6    judgment on the matter in question." *Indep. Training & Apprenticeship Program v.*
7    *Cal. Dep't of Indus. Relations*, 730 F.3d 1024, 1034-35 (9th Cir. 2013) (quoting
8    *W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 984-85 (9th Cir. 2012)). Indicia
9    of the latter include, among others, "conflicts between the agency's current and
10   previous interpretations." *Price*, 697 F.3d at 829 n.4.

11        EPA's purported interpretation is inconsistent with both the plain
12   meaning of 40 C.F.R. § 122.26(a)(9) and the agency's own prior statements on
13   the regulation. EPA claims that, even once the triggering determination is
14   made, the agency retains discretion to decide whether to require permits. *See*
15   EPA Br. at 17-18. This interpretation, which interprets "shall" to mean "may,"
16   is contrary to the regulation's text.

17        Further, although EPA contends that its litigating position represents its
18   longstanding interpretation of its regulations, the documents it cites undermine
19   that statement. Indeed, the letter cited in EPA's brief as expressing the
20   agency's interpretation, *see* EPA Br. at 18, confirms that EPA itself
21   understands the regulations to require permits for sources that are contributing
22   to violations of water quality standards. That letter provides that "40 C.F.R.
23   § 122.26(a)(9) *requires* a permit to be obtained when, on a case-by-case basis,
24   the permitting authority determines that a storm water discharge is *contributing*
25   to a violation of a water quality standard." Decl. of Sarah V. Fort, Ex. A
26   (Letter from G. Tracy Mehan III, Assistant EPA Administrator, to Elizabeth
27   McLain, Secretary, Vt. Nat. Res. Agency (Sept. 16, 2003)) at 1 (first emphasis
28   added). The letter further states that, though there might not always be enough

17

information to determine which sources should be regulated, "where such information exists, NPDES permits should be required for storm water discharges found to be contributing to standards violations." *Id.* at 2.

Nor can EPA rely on the preamble to its stormwater regulations to support its current interpretation. EPA points to the Phase I rule preamble as "describ[ing] the factors EPA would weigh" in deciding whether a discharge contributes to violations of water quality standards. EPA Br. at 19. Even if EPA may weigh relevant factors in determining whether these sites are contributing to a water quality impairment, having already made the determination that they are, it may not now refuse to require permits based on other considerations. Further, the language cited by the agency refers to factors to be considered when making the separate determination as to "whether a storm water discharge is a significant contributor of pollution to the waters of the United States"—not to factors to be considered in determining whether discharges are contributing to water quality violations in a particular watershed. 55 Fed. Reg. 47,990, 47,993 (Nov. 16, 1990).

Similarly, EPA's reliance on the preamble to the Phase II rule as supporting the agency's authority to consider whether "sources were adequately addressed by other environmental programs," EPA Br. at 19, is misplaced. The preamble indicates that, in deciding whether to issue regulations for certain source categories, EPA considered the question of whether source categories were adequately addressed under other *statutes*, "such as programs under the Resource Conservation and Recovery Act (RCRA) or the Occupational Health and Safety Act (OSHA)." 64 Fed. Reg. 68,722, 68,780 (Dec. 8, 1999). It does not support EPA's current assertion that, having issued regulations that require permits for particular types of stormwater pollution sources, it may now make ad hoc decisions as to whether to require compliance with those regulations.

1    EPA's current interpretation of 40 C.F.R. § 122.26(a)(9) is not the result

2    of steadily applied agency expertise; rather, it is a "convenient litigating

3    position" that is owed deference only proportional with its "power to

4    persuade." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155, 159

5    (2012) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) &

6    *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001)). Here, that power to

7    persuade is absent. EPA has determined that commercial site stormwater

8    discharges in the Dominguez and Los Cerritos Channels are contributing to

9    violations of water quality standards, and the agency's own regulations now

10   require those sources to obtain NPDES permits. This Court has the authority

11   to compel the agency to fulfill its mandatory duty to regulate these sources.

12   **II.    This Court is the proper forum for Plaintiffs' APA claims**

13   Plaintiffs' complaint also alleges, in the alternative, that EPA violated

14   the APA by (a) denying Plaintiffs' petitions based on improper and irrelevant

15   factors, and (b) relying on the adequacy of existing programs that are unlikely

16   to achieve water quality standards. Compl. ¶¶ 86-91. This Court has

17   jurisdiction over these APA claims unless the Clean Water Act has divested it

18   of jurisdiction. *See Nw. Envtl. Advocates*, 537 F.3d at 1015.

19   The Clean Water Act provides for exclusive appellate court jurisdiction

20   over challenges to seven types of agency actions. *See* 33 U.S.C. § 1369(b)(1). In

21   specifying a separate review procedure for these actions, Congress sought to

22   promote certainty in and reliance on a set of core EPA actions that form the

23   backbone of the Clean Water Act's implementation. *See Narragansett Elec. Co. v.*

24   *U.S. EPA*, 407 F.3d 1, 5 (1st Cir. 2005) (stating that § 1369(b) seeks "to protect

25   the EPA's interests in finality in certain matters"). Accordingly, § 1369(b)(1)

26   abrogates the APA's standard six-year statute of limitations for the listed

27   actions, *see* 28 U.S.C. § 2401(a), which instead must be challenged within 120

28   days. 33 U.S.C. § 1369(b)(1). Listed actions cannot be challenged in any later

19

civil or criminal proceeding for enforcement. *Id.* § 1369(b)(2). This short statute of limitations "ensure[s] that [these] actions are reviewable, but that the review will not unduly impede enforcement." H.R. Rep. No. 92-911, at 136 (1972). The Ninth Circuit "has counseled against expansive application of section 1369(b)." *League of Wilderness Defs. / Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1190 n.8 (9th Cir. 2002); *see also Nw. Envtl. Advocates*, 537 F.3d at 1015 ("We do not lightly hold that we have jurisdiction under section [1369](b)(1).").

Section 1369 provides for appellate court jurisdiction over actions "in issuing or denying any permit." 33 U.S.C. § 1369(b)(1)(F). This makes sense in light of Congress's purpose in providing for appellate review during a short period of time. The NPDES permitting regime is the Clean Water Act's primary implementation tool, *see Nw. Envtl. Advocates*, 537 F.3d at 1022, and successful implementation depends on EPA's ability to issue, deny, and enforce NPDES permits. Allowing a permit to be challenged years after it was issued—including as a defense to enforcement—would undermine the Act's efficacy.

It is equally clear why, in interpreting the Act, courts have held that challenges to regulations that broadly govern the issuance of permits belong in appellate court. *See, e.g.*, *Am. Mining Cong. v. U.S. EPA*, 965 F.2d 759, 763 (9th Cir. 1992). To have certainty in the validity of permits, the agency and the public must also rely on the validity of the regulations on which those permits are based. If a discharger—in defending against an enforcement action for violating a permit term, or in seeking to avoid permitting altogether—could challenge the validity of a permitting regulation that was promulgated years earlier, EPA's regulatory and enforcement actions would be chilled. Thus, courts understand § 1369(b)(1) to apply to regulations that govern subsequent permits, reasoning that it would be "truly perverse" for such regulations to be

reviewed in a different court than the permitting decisions themselves. *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 136 (1977).

This case does not challenge either a permit issuance or denial or a regulation governing permits. The action at issue here—EPA's denial of two citizen petitions—is different in function and effect from either an individual permit issuance or a regulation governing that decision. An individual permitting decision and a regulation governing permitting both have a prospective effect on the behavior of the regulator and regulated parties; they bind the agency to regulate in a particular way, and they bind regulated entities to comply or face enforcement. Quick review in the appellate court protects the shared interests of the agency, the public, and the regulated industry in the finality of those actions.

EPA's action here, by contrast, has none of the possible effects of a regulation governing permitting. It subjects no party to regulation; nor does it even provide the certainty of a regulatory exemption, as EPA expressly reserves the right to require permits from these sources at a future time. Instead, the petition denials are a statement of the agency's current view of its regulatory priorities. The challenged agency actions are thus entirely unlike a regulation. Accordingly, the rationale for quick appellate review does not apply here, because review in the normal course would not upend the agency's ability to implement the statute. There is nothing "truly perverse" about reviewing EPA's petition denials in this Court.

EPA has cited to no case where a court has extended the reach of § 1369(b)(1)(F) to a challenge of any action other than an individual permit issuance or denial or the promulgation of a regulation governing permits. EPA relies on the Ninth Circuit's decision in *Northwest Environmental Advocates* to support its broad interpretation of § 1369(b)(1)(F). EPA Br. at 21-22. But that case stands for the proposition that the Ninth Circuit interprets § 1369(b)

narrowly, such that not even all regulations that relate to permitting fall within the ambit of paragraph (b)(1)(F). It does not support the expansive standard for appellate jurisdiction that EPA announces here.

In *Northwest Environmental Advocates*, the Ninth Circuit found it did not have original jurisdiction over a challenge to a regulation that exempted several categories of discharges from the Act's NPDES permitting requirements. *See* 537 F.3d at 1011, 1015. The court reasoned that, because the effect of the regulation was to remove sources from the permitting regime, not to govern any subsequent permitting decisions, the regulation was not like other permitting regulations that the court had reviewed under paragraph (b)(1)(F). The court quoted approvingly from a district court decision explaining that,

> [b]ecause [plaintiff] challenges a decision that in effect excludes sources from the NPDES program, the circuit courts will never have to confront the issuance or denial of a permit for these sources. The Ninth Circuit, by virtue [of the regulation], will never have to consider on direct review an action involving the denial of an NPDES permit for pollutant discharges [within the exemption provided by the regulation]. Thus, a district court taking jurisdiction over a challenge to the silvicultural regulation does not create the same awkwardness for a circuit court.

*Id.* at 1018 (quoting *Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.*, 266 F. Supp. 2d 1101, 1115-16 (N.D. Cal. 2003)). The court distinguished the case before it from cases involving challenges to regulations that clarify exemptions set out in the Clean Water Act itself. *Id.* at 1017-18. The court reasoned that such regulations seek to separate discharges that do need permits from discharges that do not need permits, and thus involved the "issuing or denying [of] any permit" such that review is proper in the courts of appeals. *Id.* But the court held that regulations that only exempt sources from permitting and are not

22

1   based on exemptions in the Act, such as the rule before it, should be

2   challenged in the district courts. *Id.*

3        EPA argues that this action is covered by paragraph (b)(1)(F) under the

4   reasoning of *Northwest Environmental Advocates* because Los Angeles

5   Waterkeeper's challenge is "grounded in permitting requirements contained in

6   the [Clean Water Act]," EPA Br. at 22, but that argument is contradicted by

7   the holding of the case. There, as here, the plaintiffs' claims were grounded in

8   the Act's permitting requirements—both cases involve claims that EPA is not

9   regulating discharges that the Act requires it to regulate. *See Nw. Envtl.*

10  *Advocates*, 537 F.3d at 1011-14. Nonetheless, the Ninth Circuit found that

11  § 1369 did not apply to the challenged agency action in *Northwest Environmental*

12  *Advocates*. *Id.* at 1017-18. The same is true here.

13       Even if this Court were to accept EPA's argument that a petition denial

14  is analogous to a rule governing permitting, *Northwest Environmental Advocates*

15  would preclude appellate court review here. To the extent that EPA's petition

16  denials have any impact on permitting, that impact is only to exempt

17  commercial sources from NPDES permitting requirements, and the exemption

18  is not found in the Act itself. Thus, EPA's action here is at best analogous to

19  the type of regulation that the Ninth Circuit has held is not reviewable in the

20  first instance in the courts of appeals.

21       At its heart, EPA's argument is that, because some actions that relate to

22  permitting are reviewable in the court of appeals, this one should be, too. That

23  argument ignores Ninth Circuit decisions refusing to exercise jurisdiction over

24  other actions that "relate" to permitting. *See, e.g.*, *S. Cal. All. of Publicly Owned*

25  *Treatment Works v. U.S. EPA*, 853 F.3d 1076, 1081 (9th Cir. 2017) (dismissing

26  for lack of jurisdiction a challenge to EPA's objection to draft state-NPDES

27  permits); *Nw. Envtl. Advocates*, 537 F.3d at 1015.

28       Not every jurisdictional bifurcation is "irrational" or "perverse." *See*

23

EPA Br. at 23. That is true even if similar actions are reviewed in different courts. *See S. Cal. All. of Publicly Owned Treatment Works*, 853 F.3d at 1085-86 (noting that review of EPA objections to a state-NPDES permit would be in state court if the state issued a permit adopting EPA's objections, but in federal court if EPA issued the permit itself); *Bethlehem Steel Corp. v. U.S. EPA*, 538 F.2d 513, 517 (2d Cir. 1976) (concluding Clean Water Act bifurcates review of effluent limitations and approval of state water quality standards despite relationship between the two regulations); *NRDC v. Train*, 519 F.2d 287, 290-91 (D.C. Cir. 1975) (published list of toxic substances is reviewable in the court of appeals, but failure to list substances is reviewable in district court). Congress provided for prompt review in the court of appeals of EPA actions with immediate regulatory and enforcement consequences; it did not provide for such review of some other agency actions lacking those consequences. *See Boise Cascade Corp. v. U.S. EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991) ("[Section 1369(b)'s] specificity demonstrates that Congress did not intend court of appeals jurisdiction over all EPA actions taken pursuant to the Act.").

EPA's reliance on *Maier v. U.S. EPA*, 114 F.3d 1032 (10th Cir. 1997), to support a contrary result is misplaced. EPA Br. at 23. *Maier* involved a challenge that was styled as a petition to revise regulations, but that the court understood to be, in substance, a challenge to an existing regulation. 114 F.3d at 1036-38. The court rejected the notion that clever pleading should defeat appellate court jurisdiction, reasoning that "[w]here petitioners' challenge is to the substance of a regulation that the agency has already promulgated, exclusive jurisdiction in the court of appeals may not be evaded merely by styling the claim as one for failure to revise." *Id*. at 1038. That court itself acknowledged that § 1369 "arguably does not apply to [EPA's] refusal to promulgate a rule in the first instance." *Id*. at 1037. Thus, *Maier* is consistent with the position that § 1369 does not apply to EPA's petition denials.

Finally, EPA's arguments that jurisdictional ambiguity favors review in the court of appeals are inapplicable in light of the Ninth Circuit's repeated admonitions against interpreting broadly the actions listed in § 1369(b)(1). A general preference for appellate review cannot overcome the Ninth Circuit's specific "counsel[] against [§ 1369's] expansive application." *Nw. Envtl. Advocates*, 537 F.3d at 1015; *League of Wilderness Defs.*, 309 F.3d at 1190 n.8. EPA's denial of Los Angeles Waterkeeper's petitions is not "an action . . . in issuing or denying a permit" under Ninth Circuit precedent, and is not subject to original appellate court jurisdiction under § 1369.

## CONCLUSION

Los Angeles Waterkeeper's complaint properly alleges that EPA has failed to perform a nondiscretionary duty under the Clean Water Act or, in the alternative, has taken arbitrary and capricious action in violation of the APA. This Court has jurisdiction to resolve Los Angeles Waterkeeper's claims, and EPA's motion should be dismissed.

Respectfully submitted,

/s/_____

Steve Fleischli (CA Bar No. 175174)
sfleischli@nrdc.org
Natural Resources Defense Council
1314 Second Street
Santa Monica, CA 90401
Tel: (310) 434-2328
Fax: (310) 434-2399

Sarah V. Fort (admitted *pro hac vice*)
sfort@nrdc.org
Aaron Colangelo (admitted *pro hac vice*)
acolangelo@nrdc.org
Nancy Marks (admitted *pro hac vice*)
nmarks@nrdc.org
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Tel: (202) 513-6247
Fax: (415) 795-4799

*Counsel for Plaintiffs*

Dated: September 8, 2017

25